Thank you, Your Honor. May it please the court. Judge Wilkinson, Judge Floyd, and Judge Wynn, of course, my name is Louis Lang and I represent the appellant in this matter. This afternoon before the court are two issues, both involving the denial of suppression motions by the district court. One suppression motion involved a statement my client made following a traffic stop on June 27, 2012. That traffic stop occurred about the same time or approximately the same time as a search of a home located on Stedham Road here in Columbia, South Carolina, from which my client had just departed in a blue Ford SUV. And that is the subject of that search is the subject of the second motion suppression motion that Judge Anderson denied. And that was is an attack by the appellant on the affidavit that was submitted in support of that motion for suppression. The facts of the case regarding the traffic stop are as follows. On June 27, 2012, the search warrant subject of the second motion to suppress had been issued and the of the Stedham Road house. My client, in addition, part of that execution team was a investigator, Gwen, who set up to surveil the Stedham Road house. He did that for maybe 20 or 30 minutes according to his testimony. And he observed my client going in and out of the Stedham Road house to the SUV maybe a couple of times. After 20 or 30 minutes, my client got into the vehicle and drove away from the Stedham Road house. He drove for maybe one, maybe two blocks. It's unclear from investigator Gwen's testimony exactly how far he got, probably about two blocks. And at which point, Officer Gwen, who was driving an unmarked vehicle, stopped my client, got him out of his car or his SUV, took him back to the unmarked police car, mirandized him, and asked him where he was coming from. At which point, my client said he was coming from the Stedham Road house and that he was... What do we do with Judge Anderson's square actual finding? He says his hearing testimony reveals investigator Gwen had reasonable suspicion to make the stop due to a traffic infraction. And after that, there were Miranda warnings. And I assume that the subsequent questioning depended on whether there was reasonable suspicion of criminal activity. But what do we do with the factual finding that Judge Anderson made? That there was a traffic violation, that he had reasonable suspicion to make the stop. Officer Gwen testified twice. He testified in 2015 at the trial of the case, and he testified again in 2019 after the remand. When he testified in 2015, which is, of course, much closer in time than 2012 when the actual stop occurred, he said that he stopped the vehicle and when he was driving and he was asked the question, and this is at Joint Appendix page 54, he was asked the question, did you charge him with anything, him being my client? And his response was, I did not. Now, when he testified again in 2019, for the first time he said that he had stopped my client because of a failure to signal a turn. And I understand the question, Judge Wilkinson, I understand the deference to the factual findings of the district court because they're the people who actually see the witnesses testify and judge their credibility. But isn't that the factual finding we're reviewing here? It is. And I would suggest to the court that with all due respect to Judge Anderson, who's a fine district judge, before whom I've practiced for many years, he just flat got it seven years after the stop when Officer Gwen was no longer a police officer and could barely remember the events of June 27, 2012. When you say he got it wrong, isn't that a question of credibility? Well, you know, it is a question. I'm sorry. Isn't it a question of Officer Gwen's credibility? It is a question of Officer Gwen's credibility. And how do district judges get that wrong? Well, of course, they have the opportunity, as this court doesn't, to actually observe the witnesses. But in this circumstance, which is relatively unique, we have an observation in 2012, actually in the trial of the case where Officer Gwen says nothing about a traffic stop now I remember it was a failure to signal a turn. And there's no document ever produced by the government. Did you bring the supposed inconsistency to the judge's attention? I did, Your Honor, both that argument and in the brief I submitted, I believe, in support of my motion to suppress. Okay, so, excuse me, counsel. In other words, you're concerned about the inconsistency, fairly so, and you brought that to Judge Anderson's attention. Yes, I'm sorry. You should have, and so he was well aware of the alleged inconsistency, and he still made the factual finding that he did. He did do that, Your Honor. But again, giving great deference to the factual findings of the district court is not the same thing as giving absolute deference. I think there have to be circumstances where this court can review that kind of factual finding based on credibility. And I know the court... Let me just say, a couple of questions. Is Officer Gwen aware of the information that Officer Carwell had when he applied for the search warrant? I'm sorry. Again, Judge, I'm having trouble hearing you. My apologies. That's probably my fault. I was wondering whether Officer Gwen, when he made the traffic stop and was he aware of either the actual affidavit that Officer Carwell had filed or was he aware of the information, the background information that Officer Carwell had used in his affidavit? You know, Judge, there's very little evidence of that in the record. The only testimony, I think, from Officer Gwen or Investigator Gwen at the 2019 suppression motion hearing was that, and I cite this in my brief, Officer Gwen, I believe, said he didn't have a clue what cars or vehicles may have been mentioned in the search warrant itself. Did Officer Gwen have any involvement at all with the CI who went to the house with the funds and came away with the drugs? No, sir. I believe Officer Gwen, his only involvement was as a surveillance officer on the day, June 27th, the day of the execution of the warrant. Did Officer Gwen have any involvement with the CI? No, sir. No, sir. He did not, as far as I know, had no involvement whatsoever with the CI. His only involvement began and ended on the 27th of June. And, of course, the controlled purchase occurred on June 25th, a couple days before. Mr. Lang, was the seizure of Hall after the traffic stop ever contested below? It was, Your Honor. It was not contested at the original trial of the case back in 2015. On the remand, it was contested by way of a motion to suppress, where this very issue was argued before Judge Anderson. And Judge Anderson issued a written order, which is part of the joint appendix, denying the motion for suppression of that statement, based upon what Judge Wilkinson and I were just talking about, and that is that alleged traffic violation. Judge Anderson found that there was probable cause to believe there was unlawful activity based upon that failure to signal a turn. So, it was litigated the second time, well, the second time the case came before Judge Anderson. It was not litigated during the trial, the actual trial of the case. So, given all those circumstances and those facts, Your Honors, I would suggest to the Court that the seizure of my client at that traffic stop was unlawful. There's no basis, was no basis, independent of the search warrant to do that. And accordingly, I would suggest to the Court that the statements that were made, even though he's Mirandized, should be suppressed at this point in this case. Moving on, if I could, Your Honors, to the affidavit. Of course, the case on remand was for Judge Anderson to hold a Franks hearing. He did that last fall, in September, I believe, of last year. Excuse me, I want to make, everyone, I want to come back to the stop in question. I thought Officer Glynn had observed Paul moving between the car and the home for 20 to 30 minutes. He did. He observed, and he testified, he observed my client going to and from the home and the car, he said a couple times. Hold on a minute. Why would he be observing Paul moving between the car and the home for 20 to 30 minutes? That's the information that Officer Carwell used in filing the affidavit for the warrant. I mean, he didn't just, Officer Glynn didn't just show up in front of Paul's house by chance. You know, I mean, police just don't say, oh, well, I think I'll go look at this. He must have had, he must have had some reason for showing up outside of Paul's residence and observing the occupant's movements. He did, Your Honor. He was part of the, what I call the search warrant execution team. And his role, he was not going to enter the house. His role was to set up 20 to 30 minutes prior to the execution of the warrant and simply surveil the house. That was his testimony, both at trial and at the suppression motion hearing in 2019. Did he know that the search warrant was going to be served? He did. He was aware that the search warrant was going to be executed on the house. And his role was... Well, if he knew that the search warrant was going to be executed, then was there not probable cause for the automobile search, irrespective of whether the officer, Gwen, had actually seen the warrant affidavit in its particulars. If he knew that there was an outstanding search warrant and that it was going to be served and he was watching and surveilling the house, that would seem to me to contribute to the existence of probable cause in undertaking the automobile search. Very briefly, Your Honor, I don't think Officer Gwen was... He did not know, nor did Officer Carwell, the identity of my client. And that goes to the search warrant issue. There was nothing in the search warrant that would give anybody any idea of who lived in that house, who stayed in that house, who was associated with that house. There was nothing whatsoever in the warrant or in the affidavit that would give anybody a clue, police officer or otherwise, that my client, Harold Hall, was associated in any respect to that house. Now, in direct answer to your question, Judge Wilkinson, of course, I cite the cases of Summers v. Michigan and Bailey v. United States, where the Supreme Court said in Summers that the police, that is, could detain individuals who are present at the scene of a search warrant execution. And in Bailey, the court kind of expanded that maybe a little bit and said police officers could detain those who were within the immediate vicinity of the execution of the search warrant. But my client was in neither of those cases. Officer Nguyen stopped him and mirandized him and asked him the questions and he made an inculpatory statement, which is the purpose of this motion to suppress, to keep that inculpatory statement, which we suggest was the fruit of an illegal seizure of my client, from getting to the jury. I see my time is about up, Your Honors. I'd be happy to answer any further questions. I have five minutes of rebuttal time reserved and would stand on my brief at this point in regard to the search warrant issue. Thank you, Your Honor. Colleagues, are there any questions for you? There are no questions. We'd like to hear from Mr. Andrews. Thank you, Judge Wilkinson, and may it please the court. I'll begin with the traffic stop issue, as that's the most recent matter of discussion that the court has heard. Your Honor, as Judge Wilkinson just indicated, the record is clear that when Officer Nguyen observed the occupants of the Blue Expedition leaving the Stedham Road house, he followed the car for a couple of blocks. His testimony is that he then observed a failure to turn, he executed a traffic stop, and at that point, he was entitled, it was a valid stop, he was entitled to ask questions of the driver. In this case, Judge Anderson found that Mr. Nguyen's, Officer Nguyen's testimony on that question was credible, and in fact, this issue was explored at length at the hearing, and he was cross-examined by appellant's attorney, and on redirect, he said he was simply never asked about this at the initial trial. So there's not an inconsistency here in the fact that there's any evidence that suggests it never happened. Perhaps there's a question raised as to why it wasn't raised in his initial testimony at trial. He explained that, and Judge Anderson accepted it. What you also have, though, here is an alternative means of validity for the stop, which is that you have the reasonable suspicion that the vehicle leaving this house... One thing I wanted to ask you, Mr. Sanders, is, you know, let's say you have reasonable suspicion to conduct a traffic stop, that doesn't automatically give you reasonable, it gives you the ability to ask for a license and to ask for a registration and to do a data check, but does that give you the ability to just launch into questioning of an occupant of a car when you, when someone's detained purely for a traffic stop? So, Your Honor, I think it would depend on the nature of the reasonable suspicion. The court has found, since Terry, that the purpose of an investigative stop, the officer may ask questions. If there's a reasonable suspicion of criminal activity, the officer may ask questions in furtherance of that suspicion until the point... Okay, now we get to the W. What was the counsel that said that Officer Nguyen had very little knowledge of Paul and his activity and the search warrant and that it was going to be served, and he said really that he was just in a surveillance capacity and didn't have very little knowledge of the search warrant, and, you know, raised some questions about that, and I'm just wondering what your view is. Well, Judge, I think that the record reflects that Officer Nguyen was familiar with the search warrant and the search warrant affidavit, and so he may not have known all the necessary background details, but he knew that a controlled purchase had been made at that house a couple of days before, and he knew that a magistrate had authorized a search warrant for that house looking for drugs and drug-related paraphernalia. The warrant had been indicated for that particular residence? I'm sorry, Judge, I didn't hear that question. The search warrant had been approved for that particular residence. That's correct. Did Officer Nguyen know that? He did know that. He had seen the warrant. He knew that it extended to vehicles that may have been related to the vehicle. That makes it a little more than just the traffic spot. I think, Judge, if you're asking the question whether there was probable cause, I think that's certainly arguable, but I think there's no question that he had a specific reasonable suspicion that there may be criminal activity. I want to go, too, to the nature of the questions that he asked. The questions that were asked here are perfectly innocuous questions, and, Judge, to your point, they're exactly the type of information that would already be reflected on a registration or a license. Once he asks, he conducts the stop, he asks Mr. Hall, who's the driver, he doesn't know who he is at that point. He asks him to step out of the vehicle. He gives him a frisk. He mirandizes Mr. Hall because he has some suspicion that Mr. Hall may give a statement that's going to incriminate himself, and then he asks simply, where are you coming from? Who are you? Where do you live? And those are the types of questions that drivers are asked all the time during any traffic stop. Mr. Hall then gives a voluntary statement, post-miranda, and it's not until after that, once Officer Gwinn receives a radio from his colleagues who were executing the search warrant, that the warrant has been executed, that he then takes Mr. Hall and the other adult occupant of the Mr. Hall arrested for the traffic violation? No, he was not, Your Honor. Judge, rather, Officer Gwinn speaks about that. He says, you know, once we were able to establish that these people were associated with the house and with the drugs and the guns that were found there, I let those investigators take care of the charges. So he was never charged with the traffic infraction, but in our view, he didn't need to be once they had probable cause to arrest him on other charges. Those were the charges that went forward. So once we have, you know, the initial stop, he's entitled to ask some manner of investigatory questions, and I would suggest to the court that as far as an intrusion on privacy goes, these types of questions would be the least invasive that you could imagine. They really just go to who he is, where he's coming from, where he lives. That's at the point where he says, I live at the Stedham Avenue house and I live there alone. That's the incriminatory statement that's the subject of this entire proceeding, and I think you either have the reasonable suspicion for the investigatory stop, Judge Wilkinson drafted the opinion in Taylor that we cite in our brief 30 years ago, very similar facts in that case where the law enforcement officers were present at the scene of a house to conduct a search warrant. They saw people get in a vehicle and drive away. They conducted a stop, ordered everyone out, and at that point, this court found there was reasonable suspicion for an investigative stop before the arrest was made based on contraband that was found on their persons at the time. So address our decision in Taylor in light of the United States Supreme Court recent decision in Bailey. So your honor, I was just about to talk about Bailey. We would not urge upon this court that Bailey provides a foundation for this stop. We're not arguing that this would be the immediate vicinity. Obviously in Bailey, the Supreme Court imposed a limitation on its prior ruling in summers that really those types of detentions, which would be a detention solely for the purpose of holding a person while a search warrant is executed, they must be conducted in the immediate vicinity, and we don't believe this is in the immediate vicinity. On the other hand, I do believe that Bailey has quite a lot to say about the facts of this case. If you look towards the end of Justice Kennedy's majority opinion, Justice Kennedy says that our holding today in Bailey does not otherwise restrict in any way the ability of law enforcement officers to make otherwise valid stops in circumstances like these. Justice Kennedy specifically mentions that there may be circumstances such as those in Bailey and such as those here where people leaving the scene of a house that has been served with a valid search warrant may be detained briefly under a Terry stop for investigative purposes. Justice Kennedy also mentioned that in that particular case, had the search warrant team radioed the traffic stop team and told them that the warrant had been executed and recovered illegal materials, that you might have had a probable cause and valid sufficient and independent basis in that case to make an arrest. I would urge upon the court that those statements here made before handcuffing or after the handcuffing? Your Honor, I believe that the record reflects that they were made before the handcuffing. I think it's helpful. We have the parties have been selective about what portions of the very vast record in this case have been included here. Obviously, we have the suppression testimony here, which is in the immediate joint appendix, but you also have Officer Gwynn's testimony at the initial trial as well. I think both of those read together provide a timeline here that makes clear that the traffic stop was made. He asked Mr. Hall to step out of the car. They walk back to Officer Wynn's car. He's Mirandized and frisked. The questions are then asked, and it's not until later once the search warrant is executed and he receives word of that, that he puts the handcuffs on. One other thing I would mention... Let me ask you one question. What do you think supplied probable cause here and probable cause to do what? Probable cause for the arrest, sir? Yeah, I know you would have probable cause either for an automobile search or probable cause for an automobile search. I'm talking about probable cause for the arrest. That's when the handcuffs are put on. Now, at that point, Officer Gwynn is already in possession of the statement. Mr. Hall has said, I live there and I live there alone, and now he's heard from officers that there's 10 pounds of marijuana and three firearms in that house. He puts those together. He's got probable cause to make the arrest. Now, as to probable search of the car, I don't think they might... I don't know that the car is searched until after that arrest is made. At that point, there's a quantity, I think, of marijuana found in the vehicle, but certainly that search would be allowable under the automobile exception would be our argument. But as respecting the statement... And what provided the probable cause for the automobile search? That would be the arrest of the driver. And then we also have the issue that about the search warrant, which encompassed cars associated with the owners of the house. At that point, you have Mr. Hall's admission that he's the owner of the house. One other fact I just wanted to mention that the record bears out. At this point, Mr. Hall has been stopped. We know that his driver's license is in the pocket of a shirt back at the house wrapped in a thousand dollars. This issue wasn't brought up at the hearing. I just point that out to the court that it appears Mr. Hall, who was driving the car at that time, did not have his license on him. And so you have a number of issues, I think, that grant Officer Gwynn the authority to ask him those investigatory questions and then to receive the answers he gets back that he lives at the Stedham Avenue house and he lives there alone. So when the defendant was arrested, you are saying that the officers at that time knew what had been found at the house? Your Honor, that's my understanding. He knows at that point that the search warrant has been executed. I believe that that's his testimony. And the trial record, I think, reflects... My question goes to what he knew as to what was found, not the execution of a warrant or not that warrant had been sought. At the time that he decided to arrest, which I think we probably can agree that handcuffing and arrest exceeded the permissible scope of a terrorist stop, did he know what had been found at the house? Or did he only know that there was a warrant served and it was about to be executed? I can't point, Your Honor, to specific statement in the record that says that. I think the inference taken from his testimony is that he knew at that point that the contraband was found at the house. But if Your Honor... Inference from his testimony meaning what? I mean... Meaning that he testified, he received a radio... He either says it or he doesn't see it. I mean, other than I just arrested him and then it gets muddled about stuff was found, but you don't know he arrested him because of that. He's in a terrorist... And Judge Wilkerson's question goes to what then establishes the probable cause. The probable cause... Well, two points and I want to be very clear with Your Honor. The statement that I understand to be in the record is that he made the arrest after the execution of the search warrant. I'm not sure that he expressly says that he had heard that the guns and the drugs were recovered or that he was asked that. Does the execution of a search warrant in and of itself gives rise to probable cause for an arrest? It would not. And then we would not make that argument. So what is it that gives probable cause to arrest? Well, again, I believe that the record on the whole reflects that he was informed of the guns and the drugs that were found. I'm not sure that he expressly says that. I don't know. Well, I mean, I get where you're going. I think you probably answered it the only way you can. In other words, the record doesn't say that. He said on a whole. I don't know what that means. I mean, there's no testimony. There's no evidence there to say that there's evidence as you point correctly to say, you know, the execute, maybe the best is it's been executed, which means it could be in the process of going on or whatever. But the basis for probable cause is kind of vague right there. So I'm not sure that I necessarily disagree with your honor on that. I do believe that the judge was allowed to draw an inference that he believes that the guns and drugs had been recovered at that time. It also could be possible that I've missed something in reviewing the record. I do want to point out, though, that by the time before you slide away from that, that sounds that sounds a little dangerous to me. I mean, we do want to allow reasonable emphasis inferences. But, you know, we write something like what you've just said. It gives probable cause in a lot of situations where you may not have any clue as to what's there. You just kind of know you. I'm trying to get something a little bit more concrete there. That's beyond the Terry stop. The Bailey case makes that clear. And then it goes back to the Second Circuit and dovetails in this. But there's stronger evidence in that case that supports the probable cause. Well, judge, if I'm here and I but but but I want to be clear, that's that's really where I thought Judge Wilkerson's question was going in terms of, you know, what what gives you the probable cause here? Well, and I certainly understand. Excuse me, judge. I certainly understand the interest of the court in trying to craft a good rule and reach a good rule here. But I would I would say that we don't need to get to the probable cause for the arrest because at that point, this is about the suppression of a statement that has already been given. The statement has already been given voluntarily post Miranda during an investigative stop to the before the arrest happens. You're saying that statement is given incident to the Terry. That's correct. That's correct. The stop the stop is made. The officer is asking investigative questions. That answer is given. And it's not until after that that the arrest is made. We're talking about we're talking about the the suppression of those of the answers that were given after the Miranda war. That's that's correct. What I was going to say is, I mean, I think. Judge Anderson did. We do have specific factual findings here. I'm trying to look at this case as a whole in a little way. And we do have a major hearing both on the Frank's matter and on the suppression matter. And and there were several things that stood out in my mind about what the officer's conduct was here. I like the fact that they gave Miranda warnings right off. Another fact that I like here was that the officer didn't just take the CIA at his word. They conducted a conversation with him and they supplied him with cash. And he went, he actually went into the residence. And he came back to the officer's prison again and found no cash for the quantity of drugs. And so they were doing their best to verify. And another thing that because our regard is very narrow and fact specific and nothing that could give rise to any big state holding. One of the things. Re-establishing link. Jackie, how much time does Mr. Andrews have left? We think three minutes. Mr. Andrews, what did you see on the clock? I think that's gracious. I think I had about a minute left. I've not yet touched upon the Frank's issue. If I could have three minutes just to briefly touch on that, I would welcome it. Well, let me ask another question before you go there. When he was arrested, what was he arrested for and how did he know what to arrest him for? So, Judge Floyd, this is back to the extended colloquy I just had with Judge Wynn. My understanding and I think that the the conclusion that that the judge Anderson arrived at as well is that and I think I should say, too, I think Judge Wilkinson mentioned this in his dissenting opinion in the original case. I think the he receives word from the search team. Now, this is after they've gone into the house, after they've fully executed the warrant. At that time, they've recovered 10 pounds of marijuana, several guns and some other things. I think that's what he's arresting him for. At that point, Officer Gwynn knows that Mr. Hall has told him, I live at that house and I live there alone. And so in Officer Gwynn's mind, he's the only person that could have been in possession of those guns and drugs. I thought you made in response to Judge Gwynn's question and Judge Floyd both that the statements were made had already been the statements that are at issue here have been made before the arrest. That's right. That's correct, Judge. And I think the record and I think you have to look back at the trial testimony, but you can also look at the suppressive testimony. I think when you read those together, I think that timeline becomes clear that he asked him to step out of the car. He mirandizes him. He asked him those investigatory questions and the arrest doesn't come until later. And so I would encourage the court. I don't think the court needs to get to the question of the arrest itself and how sufficient the evidence is on that, because at that point you already have these voluntary statements. And what statements are you talking about? The only statements to issue here in this case, those that are sought to be suppressed by the appellant, is that Mr. Hall lived at that address and that he lived there by himself. As your honor may remember, that was a big issue at trial as there was this house and there were allegations that multiple people lived there. The government introduced evidence at the time that it was primarily Harold Hall's address, but that was a contested issue. And so his admission that he lived there and that he lived there alone was a matter of some value for the case, which is why the appellant was trying to suppress it. One of the things, one of the questions I had, so it seemed to me that this was a fairly coordinated police operation between Officer Carwell and Officer Gwinn. And I can't believe that Officer Gwinn was, particularly when he had been surveilling Hall's movements for that period of time, I can't believe that Officer Gwinn was ignorant of the search warrant or the goings on. He didn't just parachute into this whole thing. And so it seems to me that it's a fairly coordinated operation between Mr. Gwinn and Mr. Carwell. And beyond that, we can't, I just can't presume that the district judge was non-existent. We're going into this carefully as we should, but the district court just, he's a conscientious judge and most of our good brethren are, but he listened to the testimony and he went through all this and he's not one to just whitewash law enforcement actions. And I just think at the end of the day, we have to give him some credit on this kind of thing. And Judge, we would agree with that. This is a credibility dissemination. There's no contrary evidence in the record that suggests there wasn't a traffic stop in this case. And so we would certainly share that position. Very briefly, if I may, I know that I'm out of time. If there's no further questioning, I'd like to hear from Mr. Lyon in rebuttal, unless you have something that absolutely needs saying. We'll stand on our brief on the Frank's argument, Your Honor. All right. Thank you. And Mr. Lyon, you have some rebuttal time and we'd be pleased to hear from you. In regard to the question of the traffic stop, I want to make sure that the court understands the government counsel is correct. The handcuffing occurred subsequent to the statements that we seek to suppress. So I don't want to mislead the court or get the court confused, but that is what Officer Gwinn testified to consistently, both at the 2015 trial and the 2010 suppression hearing. What he had to say, though, and I respectfully disagree with the government in terms of what he knew was going on in terms of the search warrant itself. He said this, when he asked, when did you do, what did you do with the two male occupants at that point? And he's talking about at the execution of the search warrant. You're talking about the search as subsequent to the handcuffing and the search itself and what he knew. The statements occurred before that. Yes, sir. Which would be under the, pursuant to the Terry stop. So what he knew afterwards doesn't seem to impact that. So what, what is the basis for suppressing the statements before that happens? Well, three bases. First off, of course, I would invite the court's attention as I have before to the Bailey case. And of course, I don't disagree with the government counsel's analysis of Judge Kennedy's opinion in that case. If there's an independent basis, of course, for the traffic stop, then Bailey doesn't apply. However, I would suggest to the court that there is no independent basis. And in particular, the Terry stop. Now, the record is not clear as to how much Officer Gwinn knew or didn't know about the warrant at the time of the Terry, time of the traffic stop. But he did say this, and this is on page 138 of the Joint Appendix quote, now the search warrant listed vehicles that could be searched at the residence. Do you recall? And the answer that Officer Gwinn gave was, I don't have a clue. I listed on the search warrant. I mean, he knew nothing, but he, all he knew was that there was a search warrant that was going to be executed. And his role was very limited just to surveil the house itself, the house that was subject to the search warrant. In addition to that, at the, and this is a 2019 testimony. I come back, Mr. Lange. I mean, the way you would portray it is that Officer Gwinn was just completely in the dark. And yet he is also surveilling this house. And he's now bound to have known that he was surveilling it for a reason. And what would the reason be other than the suspected drug activity? And that if the suspected drug activity, it's very likely that an affidavit would have been filed out. And he's just not some stranger to these, to this whole operation. But again, when you look at, when you look at it as a whole, the fact that the district court held these hearings, the fact that a warrant was sworn out, the fact that that's what we want to do, the fact that they checked and double checked the CI, the fact that we have these findings here, we have a warrant issued. It, you know, there are instances of really raw, bad police behavior, but I don't, I just can't see this as being, as being one of those. You know, there are instances where the police just totally overstepped their line, but that doesn't mean they invariably do so. Well, let, let me just very briefly, my time is almost up, but invite the court's attention to page 47 of the joint appendix, where Officer Gwinn is discussing his role as a surveillance officer. Describing that basically, he says, we'll have an agent or two go to the location that we're going to be executing the search warrant. And we just do surveillance, see if there's any type of activity, movements, people coming, leaving the house, and we relay that to the entry team. That's what his role was. And what he saw was simply my client going to and from a car a couple times. And when he was asked at later on in 2010, and I don't have the, the joint appendix slide off the top of my head at the moment, but it was asked, did he see any suspicious activity? He said, no, he just saw my client going to and from. And he had no idea who my client was, what connection my client had with the house, nothing at all like that. And so I would suggest to the court, he had no basis for a Terry stop because he had no reasonable suspicion of criminal activity. Putting aside, again, the, the, the asserted traffic violation. Thank you, Mr. Lane. I'm going to ask if there are further questions, because if they are, we'll just wait until they have a chance to ask those. There are no further questions. I'm going to ask the courtroom deputy to adjourn court. You know, before you leave, I want to thank you both again for your arguments and say we appreciate it very much. And thank you for your understanding about the need to proceed virtually. We wish it were otherwise. Thank you. I hope each of you has a very pleasant afternoon. Thank you. Privilege to argue before you. Thank you very much. I'm going to ask a good courtroom deputy if you would adjourn court and move us to our conference room. This honorable court stands adjourned. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, James Andrew Wynn, Henry F. Floyd